**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,

               *Plaintiff*,

v.

JIMCY McGIRT,

               *Defendant*.

Case No.  CR-20-050-JFH

---

**GOVERNMENT'S MOTION FOR UPWARD DEPARTURE
OR, IN THE ALTERNATIVE, AN UPWARD VARIANCE FROM
THE GUIDELINE RANGE**

Respectfully submitted,

CHRISTOPHER J. WILSON
Acting United States Attorney

s/    Sarah McAmis
       SARAH McAMIS, OBA # 15903
       Assistant United States Attorney
       520 Denison Ave.
       Muskogee, OK 74401
       sarah.mcamis@usdoj.gov

July 21, 2021

**TABLE OF CONTENTS**

**STATEMENT OF THE CASE**................................................................................................ 5

**STATEMENT OF THE FACTS** ............................................................................................ 6

**ARGUMENTS & AUTHORITIES** ..................................................................................... 12

    I.    **GOVERNMENT'S MOTION FOR UPWARD DEPARTURE** ................................. 12

    II.    **GOVERNMENT'S MOTION FOR UPWARD VARIANCE PURSUANT TO 18
    U.S.C. § 3553**............................................................................................................ 15

        a.    **The Nature and Circumstances of the Defendant's Crime (18 U.S.C § 3553(a)(1))**
        .......................................................................................................................... 15

        b.    **The Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))**............... 16

        c.    **The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law,
        and Provide Just Punishment for the Offense  (18 U.S.C. § 3553(a)(2)(A))** ....... 18

        d.    **The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. §
        3553(a)(2)(B))**.................................................................................................. 20

        e.    **The Need to Protect the Public from Future Crimes by the Defendant (18 U.S.C.
        § 3553(a)(2)(C))** ............................................................................................. 21

        f.    **The Need to Avoid Sentencing Disparities (18 U.S.C. § 3553(a)(6))**..................... 22

        g.    **The Need to Provide Restitution to any Victims of the Offense** ........................... 23

**CONCLUSION** ..................................................................................................................... 23

## TABLE OF AUTHORITIES

### Federal Cases

*United States v. Rangel*,
697 F.3d 795 (9th Cir. 2012)……………………………………………….…12, 13

*United States. v. Robertson*,
568 F.3d 1203 (10th Cir. 2009)…………………………………………..12, 14

*United States v. Martinez-Barragan*,
545 F.3d 894 (10th Cir. 2008)………………………………………………….14

*United States v. Gantt*,
679 F.3d 1240, 1250 (10th Cir. 2012)……………………………………………16

*United States v. Caballero-Robles*,
197 Fed. App'x 783, 786-787 (10th Cir. 2006)………………………………….16

*United States v. Patton*,
708 Fed. App'x 488, 489-492 (10th Cir. 2017)………………………………….17

*United States v. Jones*,
332 F.3d 1294, 1301 (10th Cir. 2003)…………………………………………...20

*United States v. Gruver*,
576 Fed. App'x 864, 867 (10th Cir. 2014)…………………………………….....21

*United States v. McGuire*,
441 Fed. App'x 586, 587-589 (10th Cir. 2011)………………………………….21

*United States v. Booker*,
125 S.Ct. 738, 767 (2005)……………………………………………………….23

*United States v. Kristl*,
437 F.3d 1050, 1055 (10th Cir. 2006)…………………………………………..23

*Rita v. United States*,
551 U.S. 338 (2007)……………………………………………………………23

*United States v. Smart*,
518 F.3d 800, 806 (10th Cir. 2008)……………………………………………23

**Federal Statutes**

18 U.S.C. § 3661…………………………………………………………………….…12

18 U.S.C. 2241(c)…………………………………………………………………….14

18 U.S.C. § 3553(a)………………………………………………………….…15, 23, 24

18 U.S.C. § 3553(b)……………………………………………………………….15

18 U.S.C. § 3553(a)(1)……….………………………………………………15, 16, 17

18 U.S.C. §§ 3553(a)(2)(B)…………………………………………………………17, 20

18 U.S.C. §§ 3553(a)(2)(C)………………………………………………………....17, 21

18 U.S.C. § 3553(a)(2)(A)………………………………………………………….18, 20

18 U.S.C. § 3553(a)(6)…………………………………………………………..22

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.4…………………………………………………………………..12

U.S.S.G. § 4A1.3(a)(1)…………………………………………………..….…12, 14

U.S.S.G. § 4A1.3(a)(2)(E)…………………………………………………..…12, 14

U.S.S.G. Ch.1, Pt.A(1)(4)(b)…………………………………………………………15

U.S.S.G. § 5K2.0………………………………………………………………….15

U.S.S.G. § 1B1.1, note 1(M)…………………………………………………....22

U.S.S.G. §4B1.5(b)(1)(See also App Note 4(B)……………………………….…22

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff*,<br><br>v.<br><br>JIMCY McGIRT,<br><br>   *Defendant*. | Case No.  CR-20-050-JFH |

**GOVERNMENT'S MOTION FOR UPWARD DEPARTURE
OR, IN THE ALTERNATIVE, AN UPWARD VARIANCE FROM
THE GUIDELINE RANGE**

COMES NOW the Plaintiff, United States of America, by and through Acting United States Attorney Christopher J. Wilson and Sarah McAmis, Assistant United States Attorney, and hereby submits that the Guideline range as calculated in the Presentence Investigative Report (PSR) does not reflect the nature and circumstances of the Defendant's offenses, nor does it reflect the Defendant's repeated and escalating pattern of criminal conduct.  As such, the Government respectfully moves this Court for an upward departure or, in the alternative, an upward variance from the Guideline range identified in the PSR.

**STATEMENT OF THE CASE**

On July 31, 2020, the Government filed a Complaint against the Defendant.  (PSR, ¶ 1).  The Defendant was Indicted on August 17, 2020.  (PSR, ¶ 3).   A Superseding Indictment was filed against the Defendant on September 14, 2020.  (PSR, ¶ 5).  The Defendant was tried by a jury of his peers on November 4th through November 6th, 2020.  (PSR, ¶ 7).  The jury returned Verdicts of Guilty on Counts One, Two, and Three.  (PSR, ¶ 7).  A Draft Presentence Investigation Report

was filed on February 26, 2021 (Doc. 145). An Addendum and the Final Presentence Investigation Report were filed on June 10, 2021. (Docs. 162-163). A Sentencing Hearing has not yet been scheduled.

## STATEMENT OF THE FACTS

The Defendant is a 72-year-old man who sexually abused three children in the late 1980's and 1990's when he was in his 40's. He has been incarcerated in the Oklahoma Department of Corrections since 1997.

In 1988, the Defendant was working as a maintenance man in Oklahoma City. Two brothers, D.G., who was eight (8) years old at the time, and A.G., who was five (5) years old at the time, were watching and helping the Defendant as he worked. On or about December 22, 1988, the Defendant made D.G. pull his pants down and then put D.G.'s penis in his mouth. On or about December 23, 1988, the Defendant pulled down A.G.'s pants and put A.G.'s penis in his mouth. The boys reported the abuse to their mother and she contacted the Oklahoma City Police Department. The boys disclosed the details of the abuse in forensic interviews and during their sexual assault examinations.

During the course of the investigation, J.R., who was twelve (12) years old at the time and the half-brother of D.G. and A.G., was also interviewed. When J.R. was helping the Defendant work, the Defendant told him that he liked to look at naked people in nasty books. The Defendant asked J.R. how old he was. J.R. said he was twelve and the Defendant responded that he got his first blow job at twelve and that it was the best feeling in the world.

The Defendant was interviewed by OKC Detective Richard Jerman and denied that he had ever been alone with the boys. The apartment manager, Matthew King, corroborated the boys' statements and said that he had walked in on the Defendant alone with the boys on more than one

occasion.

On December 29, 1988, the Defendant was charged with two counts of Forcible Oral Sodomy in Oklahoma County Case Number CF-1988-7088. On January 31, 1989, the Defendant entered a guilty plea. As part of that plea, the Defendant wrote and swore to the following Summary of Facts:

> Count 1:    D.G. asked me for some more money, I gave him some the day before to do some work, I told him I would give him the money if he would allow me to put his penis in my mouth. I did this to 8 year old.

> Count 2:    A.G. came to me wanting money too. The next day I told him I would give him the money to let me put his penis in my mouth. I did this to the 5 year old.

After the Defendant pled guilty and before he was sentenced, the Court requested that State Probation and Parole conduct a Pre-Sentence Investigation. As part of that investigation, Senior Probation and Parole Officer Kathy Cooper interviewed the Defendant. The Defendant claimed that he was not homosexual and that he was not a habitual child molester. The Defendant said the abuse of the boys would be his first and last.

During the interview, the Defendant tried to explain his behavior by stating that his girlfriend had delivered a baby and that she was upset at him for spending too much time with his ex-wife. The Defendant said frustration caused him to be driven by a perverted sexual desire and that he turned from a compassionate father and husband into a self-centered man with a heart of stone. The Defendant said that his girlfriend was uncomfortable during vaginal intercourse so she would only stimulate him orally. The Defendant claimed that his penis was so large that his girlfriend's mouth got tired and therefore he was not able to ejaculate. According to the Defendant, his sexual frustration reached its peak in December during the same time that the children were always present in the apartment where the Defendant was working. The Defendant admitted that

he put the middle boy's penis in his mouth and then, on a separate day, he put the youngest boy's penis in his mouth. The Defendant was sentenced to 5 years in the Oklahoma Department of Corrections on each count and was released from prison on March 19, 1991. (PSR, ¶ 62). He then married N.B., the grandmother of his next victim, less than one year later, on January 7, 1992.

N.B. had two daughters, D.B. and N.H., and a son, M.B.. D.B. gave birth to her daughter B.B. on August 13, 1992. D.B. took a vacation to Mexico from August 8th until August 15th, 1996. B.B. stayed with N.B. and McGirt and celebrated her 4th birthday during her stay on August 13th. N.B. worked as an LPN at St. Francis Hospital from 7:00 a.m. until 7:00 p.m. and McGirt worked from home detailing cars. B.B. was in the care of McGirt while N.B. was working. N.B. described that B.B. had nightmares that week where she would shake and cry so hard that her hair would become wet. N.B. said that she would sometimes move B.B. from bed to bed in an effort to stop the nightmares.

Approximately two weeks after D.B. returned from Mexico, B.B. approached her mom and told her that she had a secret. B.B. said she had promised not to tell her grandmother (N.B.) because if she told, her grandpa (McGirt) would go to jail. B.B. said her grandpa did something bad. B.B. said grandpa put his finger inside her private and it hurt. D.B. did not want to push B.B., so she did not ask any more questions.

Approximately one week later, B.B. was with her cousin S.H., who is N.H.'s (D.H.'s sister) daughter. B.B. spent the night with S.H. on a Saturday night and the two girls were getting ready for church on Sunday morning. B.B. told S.H. about McGirt touching her. S.H. was upset and immediately woke her mother, N.H., to tell her. N.H. did not want to further upset B.B. N.H. obtained a tape recorder and sat it next to her as she began to fix B.B.'s hair for church. N.H. asked B.B. if she had fun when she stayed at grandma's. B.B. told N.H. that she could not go over

to grandma's anymore because her mother would not let her.  N.H. told B.B. that S.H. had told her that B.B. had a secret.  B.B. said grandpa touched her "down there" and pointed to her private.  She also said that grandpa put his tongue there and he had made her touch his "weenie" and that it was "yucky and hairy".  B.B. told N.H. that she could not tell anyone because grandma would get mad because grandpa would have to go to jail.  N.H. asked B.B. where grandma was when grandpa touched her, and B.B. told her grandma was at work.  N.H. asked B.B. how many times it happened, and B.B. told N.H. "every day, every day".  N.H. told D.B. about the disclosures and the sisters contacted the police to make a report.   B.B. was then examined by a pediatrician and told him that "Grandpa put his finger inside my private parts" and "Grandpa asked me to touch his private parts with my hand".

After the police report, D.B. tried not to question B.B. too much.  Instead, she listened as B.B. disclosed details over the days and weeks as she was able and when she was ready.  Over the course of time, B.B. disclosed to her mom that when grandma was at work, grandpa would touch her private, put his finger in her private, touch her private with his tongue, and make her touch his private – which she described as "yucky with hair."  B.B. said it happened on the couch in the living room, in the spare bedroom, the bathroom, and in McGirt's truck.  D.B. described the changes she observed in B.B. after her week with McGirt.  D.B. said B.B. was angry, she thought she was ugly, and she suffered from low self-esteem.

On October 21, 1996, the Defendant was charged with one count of First Degree Rape by Instrumentation, one count of Lewd Molestation, and one count of Forcible Sodomy in Wagoner County Case Number CF-1996-355.  (PSR, ¶ 11).  The victim, B.B., was four-years-old and the abuse was alleged to have occurred between on or about August 8, 1996 and August 15, 1996.  (PSR, ¶ 8). The case proceeded to Jury Trial and the Defendant was found guilty of all three counts

on June 24, 1997. (PSR, ¶ 17). The state Jury recommended that the Defendant be sentenced to 500 years for the Rape, 500 years for the Molestation, and Life Without the Possibility of Parole for the Sodomy and the Court sentenced the Defendant accordingly. (PSR, ¶s 11, 17, 69).

On July 9, 2020, the United States Supreme Court issued its opinion in the case of *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020). The Mandate was issued on August 10, 2020. Pursuant to the Court's Ruling, the locations wherein the above listed sexual abuse of B.B. was committed by the Defendant became designated as a location within the territorial boundaries of the Muscogee (Creek) Nation reservation. The Defendant was indicted in the case at bar and on September 2, 2020, the Oklahoma Court of Criminal Appeals entered its Order Vacating the Defendant's Wagoner County conviction. (PSR, ¶ 19).

At the time of his crimes against B.B., the Defendant was married to B.B.'s grandmother, N.B. The couple remained married during the Defendant's state jury trial and after his state conviction. While he was in state prison, the Defendant sent his wife a letter wherein he apologized for the sexual abuse of B.B. and claimed that he had not been in his right mind and that the devil made him do it. The letter was a turning point, and N.B. initiated divorce proceedings. The divorce was granted on August 15, 2000.

At the time she received it, N.B. shared the letter with B.B.'s mother, D.K. B.B.'s mother read the contents of the original letter and she likewise recalled that the Defendant apologized and blamed his actions on the devil. The words and actions of the Defendant after his convictions in the Wagoner County case that became the case at bar were very similar to his words and actions in the Oklahoma County case involving D.G. and A.G. As in the case at bar, the Defendant originally denied that he abused D.G. and A.G. He later admitted to abusing both boys, but made statements in which he sought to minimize his responsibility. In the case at bar, the Defendant

10

blamed his actions on the devil.

Despite having sent the apology letter, the Defendant re-asserted his claim of innocence when his case moved to federal court. In numerous pleadings and during the federal jury trial in the case at bar, the defense repeatedly claimed that victim B.B., her mother, and her grandmother were all lying about the Defendant's abuse. Each of the witnesses faced extensive cross-examination and attacks on their credibility. Throughout the federal proceedings, the Defendant has never once accepted any responsibility for his abuse of the victim nor has he displayed any remorse for his actions or concern for the impact of his actions on the victim or others.

During the jury trial of the case at bar and as is set forth in the PSR, it became obvious that the Defendant's actions dramatically changed the outcome of B.B.'s life and continue to impact it some 25 years after-the-fact. Immediately after the sexual abuse, B.B. was uprooted and moved to Kentucky because neither she nor her mother felt safe and the Defendant's family was harassing them. B.B. was described as a "happy, loving and perfect child" before the abuse and a "destructive, angry, and defiant child" after the abuse. As a teenager, B.B. dealt with the abuse by having intense nightmares and cutting herself. She also began a pattern of entering into destructive relationships with men.

As if those impacts were not enough, B.B. was "destroyed" by having to re-live the events of her 1996 abuse in the 2020 jury trial. B.B. had to re-enter counseling but it was not covered by insurance and she currently owes $600.00 as a result. Because she had to travel to and from court for the trial, B.B.'s car broke down, she lost her job, and she is continuing to make car payments on an inoperable car.

The Defendant's sexual crimes against three different children are not the sum total of his criminal history. In addition to the sexual abuse crimes that he perpetrated and that have dominated

and kept him incarcerated for much of his adult life, the Defendant was also convicted of Unauthorized Use of a Motor Vehicle and was ultimately sentenced as to 4 years incarceration after his probation was revoked. He also served a 6 month conviction for Assault with a Deadly Weapon, was arrested for Desertion/AWOL from the United States Marine Corp, and was arrested for Driving under the Influence approximately 3 months before being charged with the sexual acts against B.B..

## ARGUMENTS & AUTHORITIES

### I.    GOVERNMENT'S MOTION FOR UPWARD DEPARTURE

A sentencing court may consider, without limitation, any information concerning the background, character, and conduct of a defendant. U.S.S.G. §1B1.4 and 18 U.S.C. § 3661. Such information may be considered when imposing a sentence within the Guideline range and when determining if, and how much, to sentence outside the Guideline range. U.S.S.G. §1B1.4, comment (background). The sentencing court can depart from the final sentencing range after examining the provisions of the Guidelines themselves and when considering factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. *United States v. Rangel*, 697 F.3d 795 (9th Cir. 2012). In U.S.S.G. §§ 4A1.3(a)(1) and (a)(2)(E), the Guidelines provide that an upward departure may be warranted when "reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."

The test for upward departures was thoroughly set out in *United States. v. Robertson*, 568 F.3d 1203 (10th Cir. 2009). The *Robertson* court held that any upward departure must meet a four part analysis: "(1) whether the district court relied on permissible departure factors, (2) whether those

factors removed a defendant from the applicable Guidelines heartland, (3) whether the record supports the district court's factual bases for a departure, and (4) whether the degree of departure is reasonable." (Internal citations omitted.) *Id.* at 1211. Applying that analysis here, the record demonstrates that an upward departure is authorized and warranted.

In the case at bar, the Defendant did not receive any points for his Unauthorized Use of a Motor Vehicle conviction for which he was incarcerated for four years, (PSR, ¶ 60). He likewise did not receive any points for the 6 months he served for his conviction for Assault with a Deadly Weapon (PSR, ¶ 61), his arrest for Desertion/AWOL from the United States Marine Corp (PSR, ¶ 67), or his arrest for Driving under the Influence which occurred approximately 3 months before being charged with the sexual acts against B.B. (PSR, ¶ 68). In addition, this Court should consider the likelihood that the defendant will commit other crimes in the future.

In the Defendant's 1988 case, he orally sodomized two young boys and clearly attempted to groom a third boy into compliance. He then confessed but offered a dubious explanation for his behavior wherein he assured the court at the time that "I am neither a homosexual or a habitual child molester. This incident was a first and last". In 1988, unfortunately, the Defendant's behavior resulted in only a 5 year prison sentence.

Not only did the Defendant break his promise that the 1988 victims would be his "last", but he did so by moving on to his next victim by marrying her grandmother less than one year after his release from the Department of Corrections. After the state jury heard the Defendant's case that is now at bar, a sentence was imposed that would ensure that he never be released from custody again; ie: 500 years for the Rape, 500 years for the Molestation, and Life Without the Possibility of Parole for the Sodomy.

A new federal punishment range went into effect on September 30, 1996, approximately one month after the dates of the Defendant's crimes. If the Defendant were to be charged with the same federal crimes today, his sentence would be a mandatory Life sentence. Today's statutory guidelines provide that, "If the defendant has previously been convicted of . . . a State offense that would have been an offense . . . had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison." *See* 18 U.S.C. 2241(c). Congress could not have been more unambiguous in its objective to safeguard the public from criminals who repeatedly make victims of our nation's youngest. This Defendant is precisely who Congress had in mind.

The Defendant's past conduct clearly demonstrates "the likelihood that the defendant will commit other crimes" and that his criminal history category "substantially underrepresents the seriousness of the defendant's criminal history". The "heartland" of the Guidelines is geared toward treating all similarly situated defendants the same. *United States v. Martinez-Barragan*, 545 F.3d 894 (10th Cir. 2008). The Guidelines, however, vest courts with the power to deviate from the Guideline's "heartland" when courts encounter a defendant outside the run-of-the-mill case. *Robertson*, 568 F.3d at 1213. A district court may deviate from the "heartland" when the defendant has been remarkably violent, has a long criminal history, and previous leniency was ineffective. Id. at 1214. The Defendant's prior conduct and his conduct in the case at bar is far removed from the run-of-the-mill. He has single handedly caused a lifetime of damage to multiple young children. The leniency that the Defendant was shown at the time of his first convictions for sexually abusing children obviously served as an ill-effective deterrent. The Defendant is not the prototypical defendant imagined by the Guidelines, and a departure from the "heartland" is warranted. As such, pursuant to U.S.S.G. §§ 4A1.3(a)(1) and (a)(2)(E), the Court should grant the

14

Government's Motion for Upward Departure and the Defendant should be sentenced to Life in prison.

## II.    GOVERNMENT'S MOTION FOR UPWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553

The Guidelines also provide the Court the opportunity to vary and impose a sentence above the otherwise properly calculated final sentencing range based on the application of the statutory factors in 18 U.S.C. § 3553(a).  The goal of sentencing is to achieve a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." *Id*. In doing so, the Court must account for a variety of factors specific to the particular defendant and particular case. As Congress acknowledged in the Sentencing Reform Act, and as the Guidelines state, "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision."   U.S.S.G. Ch.1, Pt.A(1)(4)(b); U.S.S.G. § 5K2.0, comment (background); 18 U.S.C. § 3553(b).

The framework for determining an appropriate sentence is set forth in § 3553(a). In particular, § 3553(a) requires that the court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (4) the need to afford adequate deterrence; (5) the need to protect the public from further crimes of the defendant; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to the victims of the offense.

### a.  The Nature and Circumstances of the Defendant's Crime (18 U.S.C § 3553(a)(1))

The Defendant's criminal conduct is extremely serious and demands an appropriately serious sentence.  Any time a child is sexually abused, the consequences can lead to a lifetime of trauma and there are certain factors that can increase the level of trauma.  The Defendant began by

sexually abusing young children who were essentially strangers to him and he "only" abused each of the boys on one occasion. However, as soon as he was released from prison, the Defendant met and ingratiated a woman with very young grandchildren. He became a grandfather-figure to the grandchildren and then used that position of authority and trust to abuse B.B. in horrible ways and to threaten her into initially keeping quiet about the abuse. He repeatedly and systematically sexually abused her by using his hands and mouth to touch her and by making her touch him.

In the first instance, the Defendant's actions most likely led to the boys' having a fear of strangers, sexual issues, anxiety and low self-esteem, among other problems. But in the second instance, B.B. was violated by a man who she and her family loved, trusted, respected, and looked up to. She was violated in the home of her grandmother – a place where she was supposed to feel safe, comfortable, and happy. The Defendant's actions have led B.B. to a lifetime of an inability to trust, all of the feelings that come with such a severe violation of trust, and an inability to ever feel truly safe. B.B. has suffered from and continues to suffer from anxiety and depression ever since that fateful week at her grandparents.

The Defendant should not be given any leniency. The guideline range calculated in the PSR, ie: 210-262 months, does not adequately reflect the nature and circumstances of the Defendant's crimes and an upward variance is appropriate.

### b.  The Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))

"[I]t is essential to keep in mind that the 'nature and circumstances of the offense' committed by a defendant, 18 U.S.C. § 3553(a)(1), can include more than the offense of which he was convicted." *United States v. Gantt*, 679 F.3d 1240, 1250 (10th Cir. 2012). In *United States v. Caballero-Robles*, 197 Fed. App'x 783, 786-787 (10th Cir. 2006), the Tenth Circuit adopted the district court's reasoning, for the purposes of 18 U.S.C. § 3553(a)(1), that the defendant's repeated

16

sexual predation of "very young girls" was "per se violent," regardless of the defendant's more sanguine view of the crimes. In *United States v. Patton*, 708 Fed. App'x 488 (10th Cir. 2017), the defendant received in January 2016 what the Tenth Circuit would later characterize as a "merciful[]" sentence at the bottom of the guidelines range after she pleaded guilty to wire fraud and attributed her having embezzled tens of thousands of dollars to a gambling addiction. But the defendant – a "wolf in sheep's clothing," as the Tenth Circuit saw her – went on to embezzle over one hundred thousand dollars from her next employer. She deposited nearly half of 49 known fraudulent checks after she pleaded guilty, but before she was sentenced, in her first case. The Tenth Circuit upheld the district court's upward variance, finding in part that it was justified by 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), and (a)(2)(C). *Id.* at 489-492.

The Pre-Sentence Investigation Report prepared for the state Court after the Defendant sexually abused two boys in in 1998 provides significant insight into the Defendant's history and characteristics. As set forth above, the Defendant made a statement which blamed both the victims and his then pregnant girlfriend for his behavior. He likewise promised that he was not a habitual "child molester" and that his abuse of the boys would be his "first and last". Despite the Defendant's assurances, the author of the Report was concerned that the Defendant did not see himself as a threat to the community. The author pointed out that the Defendant did not appear to feel any remorse toward his victims and that he did not express any concern about any present or future impact on the boys. The author found that the Defendant had used his position of employment and the vulnerability of young children to perpetrate on the victims. The author informed the court that the Defendant posed a threat to the community. The Defendant proved the author correct when he left prison and immediately sought out his next victim, gained the trust of her and her family, and then repeatedly sexually abused her without any remorse or concern

17

about her future.  To this day, the Defendant continues to show a stunning lack of remorse and appears completely unconcerned about the damage he has caused.  Given the Defendant's history and characteristics, the 210-262 guideline range calculated in the PSR does not adequately reflect an appropriate sentence and an upward variance is necessary and warranted.

    c.    **The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))**

The Defendant sexually abused B.B. and she has been dealing with the emotional, psychological, and physical consequences ever since.  The abuse has impacted every aspect of her life: B.B. suffers from anxiety and depression, she has been unable to leave her home for periods of time, she has been unable to maintain schoolwork or employment for periods of time, and she has difficulties with self-worth, trust, and relationships.

In 1996, B.B. did what society asks and expects of victims: she disclosed the abuse to family, police, and in a forensic interview.  B.B. submitted herself to a physical examination and disclosed more details of the abuse to the doctor.  She then took the witness stand, testified, and was cross-examined in front of the man who abused her and an entire courtroom of strangers.  B.B. went to counseling and spent years trying to overcome the trauma.

Just as she was finally getting to a better place in her life, B.B.'s entire world was plunged back into a black hole.  B.B. was contacted and told that the United States Supreme Court had reversed the case against her abuser and that it would all have to start over.  B.B. was then asked to open up to brand new strangers including FBI Agents, prosecutors, and a new Judge and jury.  She was disparaged and diminished in the public pleadings filed by the defense.  B.B. summoned the courage to again enter a courtroom and subject herself to direct and cross-examination about the pain she had kept so deeply buried for nearly 25 years.

Each victim who has been impacted by the Supreme Court's ruling has faced similar circumstances. But it goes much deeper for B.B. Through no fault of her own and through no choice that she had the opportunity to participate in, B.B. was thrust into the spotlight as the victim in a "famous" case. After the Supreme Court's decision, the news media has repeatedly referred to all affected cases as "McGirt cases". The news has tirelessly reported on "McGirt dockets", "McGirt dismissals", "McGirt public forums", etc. Few could understand the impact on B.B.: each and every time B.B. sees, reads, or hears any type of "McGirt" coverage, she is taken right back to the feelings she had as a helpless victim being perpetrated on by her step-grandfather some 25 years ago.

The entire process has also been extremely difficult on B.B. because she is Native American. Members of B.B.'s community constantly discuss the "McGirt" case around her without realizing she is the victim. The decision is celebrated by many in her community as an important, long awaited, and necessary decision for Native Americans. B.B. is proud of her heritage and firmly believes in the sovereignty of her tribe. However, she views the entire sea change through the lens of the person who has been most significantly impacted and who must suffer in silence while others cheer. B.B. longs for others to know that their "win" of a groundbreaking jurisdictional change impacting the entire state of Oklahoma has caused her great pain and suffering. At the same time, B.B. lives in fear that others will find out her identity and then label her as "the victim".

The Government is not suggesting that the Defendant be punished for exercising or prevailing upon his constitutional rights. He should not be treated more or less harshly for the historic ruling that resulted. Likewise, the Government does not seek to punish the Defendant for exercising his right to a federal trial. Rather, the Government asserts that the resulting impact on the victim is relevant, and should be relevant to the Court, because the Defendant's denial of

19

responsibility in the face of overwhelming evidence of guilt (1) demonstrates his lack of remorse and empathy for the victim (permissible factors for a sentencing court to consider), and (2) makes the deterrence objective all the more salient, since without recognizing and accepting his culpability, he cannot say that he is or will be rehabilitated and less likely to re-offend.

The Government also details some of the impacts on the victim as a way to notify the Court that there are many factors which take this case and the Defendant's conduct "outside the heartland". "[A] district court may properly consider the 'degree' of danger to public safety created by the defendant's conduct. The degree of danger reflects on the 'seriousness' of the offense, in accordance with 18 U.S.C. § 3553(a)(2)(A)." *United States v. Jones*, 332 F.3d 1294, 1301 (10th Cir. 2003) (internal citation omitted). The 210-262 guideline range calculated in the PSR does not adequately reflect the seriousness of the offense. To date, the Defendant has been incarcerated for approximately 288 months. A sentence of time served would not promote respect for the law nor would it provide just punishment for the Defendant's offenses.

### d. The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

As set forth above, the Defendant was previously given the opportunity to deter any future criminal conduct. The Defendant only served five years after sexually abusing two different children. He could have taken advantage of that lenient sentence and conducted himself in a manner which would prevent other children from being damaged at his hands. Instead, the Defendant took the lenient sentence and used it to his advantage by immediately securing his next victim upon his release. A significant sentence for this Defendant is necessary to deter current and future abusers and would also demonstrate to the public that the sexual victimization of children will be seriously addressed and deterred when discovered. Anything less than a lifetime in prison would send the opposite message: that even after 3 young lives have been permanently affected so

20

that a child sexual abuser could pleasure himself, he still has the opportunity to get out and pursue a fourth victim.

    **e.  The Need to Protect the Public from Future Crimes by the Defendant (18 U.S.C. § 3553(a)(2)(C))**

In *United States v. Gruver*, 576 Fed. App'x 864, 867 (10th Cir. 2014), the Tenth Circuit approved of the district court's citation of the defendant's recidivism as justification for granting an upward variance, which included a "prior . . . conviction for what is essentially the same offense as the defendant [was sentenced for]." The court found held the variance was supported by "the need to protect the public from the risk of further crimes by the defendant." Moreover, the presentence investigation report in *United States v. McGuire* revealed that the defendant had been suspected of stalking two 10-year-old girls, and sexually assaulted his 15-year-old sister-in-law in her sleep at least three times, all before ultimately kidnapping another 10-year-old girl, threatening her with a knife, and repeatedly sexually assaulting her. Concerned that "[t]here never needs to be another little girl that receives a ride from hell because of the desire for sexual gratification of this defendant," the district court imposed an upward-departure sentence of more than 14 years above the range recommended by the United States Sentencing Guidelines to "protect the public from any further crimes" committed by the defendant, quoting 18 U.S.C. § 3553(a)(2)(C). The Tenth Circuit affirmed the conviction and sentence. *United States v. McGuire*, 441 Fed. App'x 586, 587-589 (10th Cir. 2011).

As set forth above, the Defendant in the case at bar demonstrated a stunning lack of remorse after confessing to abusing his first two victims. The State Probation Officer predicted that the Defendant would re-offend by telling the court, "the defendant does pose a threat to the community". The Defendant has demonstrated 3 times over that he is sexually attracted to children and that he will use children for his sexual pleasure. The only reason that he has not yet perpetrated

upon a fourth child is because he has been incarcerated. The Defendant has never conceded that his sexual attraction toward children is wrong or illegal. He has never sought or obtained treatment and he has done nothing to demonstrate that he can break the established pattern of abuse. A guideline sentence within the range of 210-262 months will give this Defendant an opportunity to alter the course of yet another child victim's life. An upward variance by this Court will prevent that tragedy.

### f.    The Need to Avoid Sentencing Disparities (18 U.S.C. § 3553(a)(6))

The Defendant's guidelines were calculated using the 1995 Guidelines. In the last 26 years, courts, the medical community, and our society have reached a far greater awareness of the lifelong impacts of child sexual abuse. As a result, if calculated using today's Guidelines, the Defendant's Base Offense Level would be 11 levels higher. The current Guidelines also recognize that "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241. U.S.S.G. § 1B1.1, note 1(M). The Defendant would therefore receive an additional 2 levels today. Finally, the current Guidelines provide that the Defendant should be increased by 5 levels because he engaged in a pattern of activity which involved prohibited sexual conduct. §4B1.5(b)(1)(See also App Note 4(B)).

The Defendant's Guidelines must be calculated from the 1995 manual. However, when determining whether a sentencing disparity will exist and therefore whether a variance is appropriate, this Court can consider that under the 2018 Guidelines, the Defendant's Adjusted Offense Level would be at least 19 levels higher, resulting in a Guideline range of Life. Under today's Guidelines, anything less than a sentence of Life would result in Sentencing Disparity. As a result, this Court should vary from the 210-262 guideline range provided in the PSR.

g.   **The Need to Provide Restitution to any Victims of the Offense**

The Presentence Investigation Report correctly identifies the victim and the circumstances surrounding restitution from the Defendant.

## CONCLUSION

The goal of sentencing is to achieve a sentence that is "sufficient but not greater than necessary" while taking into account a variety of factors specific to the particular defendant and particular case.  At sentencing, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 125 S.Ct. 738, 767 (2005).   Under *Booker*, the district court will continue to consider the sentencing factors under 18 U.S.C. § 3553(a).  *Id*., at 764.

In *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006), the Court recognized that after *Booker,* the reasonableness of a sentence has procedural and substantive aspects to it because it "encompasses both the reasonableness of the length of the sentence as well as the method by which the sentence was calculated."  The Court in *Kristl* also recognized that the Guidelines are an important tool in creating fair and uniform sentences and a sentence within a properly calculated Guideline range is entitled to a rebuttable presumption of reasonableness on appeal.  *Id*. at 1054. The presumption of reasonableness may be rebutted by demonstrating that the sentence is unreasonable in light of the factors contained in § 3553(a).  *Id*.

Following the Supreme Court's decision in *Rita v. United States*, 551 U.S. 338 (2007), a district court's sentencing decision is reviewed for abuse of discretion.  All sentences, whether inside, just outside, or significantly outside, the Guideline range are reviewed under a deferential abuse-of-discretion standard. *United States v. Smart*, 518 F.3d 800, 806 (10th Cir. 2008).  The degree of variance will not define the threshold standard of review and a district court "need not

necessarily provide 'extraordinary' facts to justify any statutorily permissible sentencing variance." *Id*., at 807.

The Defendant is a man who is sexually attracted to very young children.  The Defendant has demonstrated that if released from prison, he will find yet another child victim.  The Defendant must be held accountable for all of the children hurt by his conduct.  Because his criminal conduct was extreme, and based on the other § 3553(a) factors addressed above, the Defendant should be sentenced to Life in prison, as such a sentence would be sufficient but not greater than necessary given all of facts surrounding this case.

WHEREFORE, the Government respectfully moves this Court to grant the Government's Motion for an upward departure or alternatively upward variance to a sentence of Life.

Respectfully submitted,

CHRISTOPHER J. WILSON
Acting United States Attorney

s/     Sarah McAmis
SARAH McAMIS, OBA # 15903
Assistant United States Attorney
520 Denison Ave.
Muskogee, OK 74401
sarah.mcamis@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Richard O'Carroll, Attorney for Defendant

s/     Sarah McAmis
SARAH McAMIS
Assistant United States Attorney